**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LORI SMITH and ROB FAM, INC.,** | : | **CIVIL ACTION NO. 1:07-CV-01207** |
| **t/a LIBERTY SQUARE CAFÉ,** | : | |
| | : | **(Judge Conner)** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF LEBANON, LAWRENCE** | : | |
| **MINNICK, DAVID LEAR,** and | : | |
| **ROBERT ANSPACH,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

This civil rights case stems from plaintiff Lori Smith's notion that the Constitution affords her the right "to engage in the business enterprise of [her] choosing" free from government interference and irrespective of the criminal laws. (Doc. 27 at 5.)  Specifically, Smith claims that the City of Lebanon violated her First and Fourteenth Amendment rights when officers questioned and arrested patrons of Smith's tavern for, *inter alia*, public intoxication, urination, vomiting, loitering, and drug activity.  In addition, Smith contends that defendants unlawfully interfered with her business in contravention of state law.  Presently before the court is a motion for summary judgment on all claims.  (See Doc. 17.)  For the reasons that follow, the motion will be granted.

## I.    <u>Statement of Facts</u>[1]

The question presented by the instant action essentially examines whether the frequent presence of law-abiding police officers in and around a neighborhood drinking establishment may subject municipal actors to constitutional tort liability. Plaintiff Lori Smith ("Smith") is owner and manager of the Liberty Square Café ("LSC"), a tavern located in a high-crime district in the northwest section of the City of Lebanon ("Lebanon").[2] (Doc. 19 ¶¶ 1-2; Doc. 24 ¶¶ 1-2.) At all times relevant to this matter, the Lebanon police department has maintained a small substation directly across the street from LSC. (Doc. 19 ¶ 3; Doc. 23 ¶ 3.) Regular staff are not assigned to the substation, but officers may access the building twenty-four hours per day to conduct department business. (<u>See</u> Doc. 18, Ex. B at 14-15.) A designated parking area for police personnel lies adjacent to the substation, but it is not uncommon for police cruisers to park on the street outside the substation, in close proximity to LSC. (<u>See</u> <u>id.</u> at 19-21.) Because of the spatial appropinquity of the tavern to the substation, uniformed officers are often visible from LSC property across the street. (<u>See</u> <u>id.</u>; Doc. 19 ¶ 3; Doc. 24 ¶ 3.) Additionally, defendant officers

_____

[1] In accordance with the standard of review for a motion for summary judgment, the court will present the facts in the light most favorable to the plaintiff, who is the nonmoving party. <u>See</u> <u>infra</u> Part II.

[2] Plaintiff Rob Fam, Incorporated, a corporate entity in which Smith is the sole officer, is also part owner of LSC. (<u>See</u> Doc. 18, Ex. D at 7.)

Lawrence Minnick[3] ("Minnick") and David Lear ("Lear") are each assigned a foot

patrol covering the immediate area, rendering their neighborhood presence

somewhat constant.  (See Doc. 19 ¶¶ 33, 46; Doc. 24 ¶¶ 33, 46.)

**A.     Initial Licensing Difficulties: 2004-2005**

On February 24, 2004, Smith received correspondence from the Pennsylvania

Liquor Control Board ("PLCB") regarding renewal of LSC's liquor license.  (See

Doc. 19 ¶ 6; Doc. 24 ¶ 6.)  The letter highlighted "allegations of abuse of [LSC's]

licensing privilege," including "sales to minors, assaults, fights, disorderly

operations and sales to visibly intoxicated pa[tr]ons."  (Doc. 18, Ex. D at depo. ex. 1.)

PLCB also noted two recent citations issued to the drinkery, one for operating

illegal gambling devices and the other for oversale of alcohol for off-premises

consumption.  (See Doc. 18, Ex. D at depo. exs. 2-3; see also id., Ex. D at 16-19.)

Although LSC's license was renewed, PLCB admonished Smith to "take affirmative

steps to prevent violations of the Liquor Code and/or employees and patrons from

engaging in inappropriate activities in and around your premises."  (Doc. 18, Ex. D

at depo. ex. 1.)

Following receipt of this letter, Smith met with defendant and Lebanon

mayor Robert Anspach ("Anspach"), and chief of Lebanon police William Harvey

("Harvey").  (Doc. 19 ¶ 9; Doc. 24 ¶ 9.)  Smith expressed concern regarding the

---

[3] The caption of the instant case incorrectly refers to defendant Lawrence
Minnick as "Officer Minnich."  (See Doc. 1.)  The correct spelling will be used
throughout this opinion.

warnings contained in the letter, while Anspach and Harvey indicated that they were theretofore unaware of PLCB's action. (See Doc. 18, Ex. D at 22.) The three also discussed various difficulties posed by LSC's neighborhood clientele and the near-constant presence of loiterers directly outside the bar. (See id. at 22-23.) This meeting marked the first instance in which Smith had spoken with either Anspach or Harvey, (see id. at 15-16), and Anspach testified that he left the encounter "thinking that we were going to . . . start a new era of cooperation" between the tavern and the city, (Doc. 18, Ex. A at 20).

After the meeting, Smith implemented several changes designed to discourage loitering, drug trafficking, and other criminality in and around the tavern. (Doc. 19 ¶ 11; Doc. 24 ¶ 11.) Specifically, LSC (1) installed additional security cameras, (2) erected a security fence to prevent congregation to the rear of the facility, (3) changed the hours of operation so that the taphouse would close earlier, (4) prohibited customers from receiving incoming phone calls to the house phone, and (5) refused to make change for $20 bills in order to inhibit $10 narcotics transactions. (See Doc. 18, Ex. D at 26-27, 30, 33-34, 41-42.) In spite of these adaptations, neighborhood residents continued to complain of publicly intoxicated customers, public urination, vomiting on the sidewalk, broken bottles, and drug trafficking activity in and around LSC.[4] (See Doc. 18, Ex. A at 21-22; id., Ex. B at 13;

---

[4] Although Smith has submitted a Rule 56 statement of material facts denying that drug activity persisted in and around LSC, (see Doc. 24 ¶ 25), her denial is unsupported by an appropriate citation to the record. Pursuant to Local Rule 56.1, Smith has therefore admitted defendants' contention. See L.R. 56.1.

Doc. 19 ¶¶ 4, 25; Doc. 24 ¶¶ 4, 25.)  Furthermore, Smith continued to observe drug transactions inside the tavern itself; Smith concedes, however, that she never contacted the police when she noticed such behavior.  (Doc. 18, Ex. D at 11-12.)

In 2005, Anspach commenced campaigning for reelection on an anti-crime platform.  (Doc. 19 ¶ 19; Doc. 24 ¶ 19.)  One facet of this campaign included a municipal effort to close "nuisance bars"—defined by Anspach as those facilities that engendered excessive complaints regarding noise, public urination and vomiting, loitering after hours, and which required law enforcement assistance on a regular basis.  (See Doc. 19 ¶ 20; Doc. 24 ¶ 20.)  According to Anspach, LSC fit this definition.  (Doc. 18, Ex. A at 9.)  He thus requested that PLCB commissioner Tom Goldsmith investigate the tavern to ensure that it was in compliance with state liquor licensing laws.[5]  (See Doc. 19 ¶ 28; Doc. 24 ¶ 28.)  Anspach did not request that LSC's license be revoked or its renewal be denied, and did not follow up with PLCB after his initial request.  (See Doc. 19 ¶ 28; Doc. 24 ¶ 28.)

**B.    License Revocation: Early 2006**

In February 2006, Smith received a letter from PLCB questioning whether LSC had abused its licensing privilege.  (See Doc. 19 ¶ 12; Doc. 24 ¶ 12.)  This correspondence referenced "six (6) incidents of disturbance at or immediately

---

[5] Anspach testified that in 2005 there were three taverns in Lebanon for which the "nuisance bar" moniker was apropos:  LSC, Evergreen, and St. Gertie's Club.  (Doc. 19 ¶ 23; Doc. 24 ¶ 23.)  It is undisputed that he provided information to PLCB commissioner Tom Goldsmith pertaining to each of these establishments.  (See Doc. 18, Ex. A at 37.)

adjacent to your licensed establishment during the time period January 2004 to the present." (Doc. 18, Ex. D at depo. ex. 4.) The incidents were reported to PLCB by the Lebanon police department and included conduct encompassing "disorderly operations, a fight and drug activity at or near the licensed premises." (Id.) Smith was advised that she would be permitted an opportunity to be heard at a future date, and LSC was afforded temporary authority to continue operations in the interim. (Id.)

Smith claims that the presence of police officers in and around LSC increased dramatically after receipt of PLCB's license renewal letter in February 2006. (See Doc. 18, Ex. D at 85.) To bolster this contention, Smith submits a log purporting to chronicle each interaction between LSC employees, patrons, and the Lebanon police in 2006. (See Doc. 24, Ex. 3.) Several of the log entries describe instances in which officers—Minnick and Lear included—entered the tavern to inquire whether those present were in possession of information sought by law enforcement. (See id.) Other log entries document occasions of law enforcement ingression into the men's bathroom to search for narcotics. (See id.) Still others record Smith's observations of police interaction with loiterers and recent bar patrons outside of the tavern. (See id.) Many simply document the presence of officers in and around the substation across the street. (See id.) In total, the log

contains forty-three entries describing varying degrees of LSC-police interaction.[6]

Smith does not contend that any of these interactions was violative of the Fourth

Amendment.

In addition, Minnick and Lear offer testimony concerning their dealings with

LSC employees and patrons, as well as employees of other Lebanon drinking

establishments, in 2006. Both officers testified that they routinely entered local

alehouses—LSC included—looking for wanted individuals or those under suspicion

---

[6] Of these forty-three entries, the court may consider only a fraction as evidence. Numerous items are replete with hearsay for which Smith offers no applicable exception. Smith's documentation for March 22, 2006 provides an appropriate example: "Minnich [sic] was in asking about a knife fight in the bar on Monday night. Jasmine [an LSC employee] told him she wasn't working but her understanding was that there was an argument but no knife fight. He also asked if we called the police about the [sic] what happened[.] She told him we didn't[,] we handled it ourselves." (Doc. 24, Ex. 3.) When Smith was questioned about the March 22 entry during her deposition, she explained that the interaction was relayed to her by Jasmine, an LSC bartender. (See Doc. 18, Ex. D at 63.) Smith provides no evidentiary justification for admission of Jasmine's statement, and the court likewise finds none. These and all like hearsay statements contained in Smith's log may not be considered as part of the summary judgment record. See Shelton v. Univ. of Med. & Dentistry, 223 F.3d 220, 223 n.2 (3d Cir. 2000) ("In this circuit, hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial."). Although each of Smith's log entries will not be analyzed in detail herein, the court offers the following general explanation regarding the admissibility of the proffered evidence: Those entries that amount to a clear recording of Smith's observations, or which Smith described in her deposition as observations, (see Doc. 18, Ex. D at 54-74), will be considered as record evidence. Those entries that consist of statements by a party opponent *made to Smith herself* will also be considered as non-hearsay under Federal Rule of Evidence 801(d)(2). Finally, those entries that appear to be statements relayed to Smith by her employees or other third parties will be deemed inadmissible hearsay for which no exception was offered by the proponent. See Shelton, 223 F.3d at 223 n.2.

7

of parole violation.[7]  (See Doc. 19 ¶¶ 36, 38, 53; Doc. 24 ¶¶ 36, 38, 53.)  Both also testified that they have never stopped and searched an individual simply because he or she was entering or exiting LSC, and there is no evidence to the contrary. (See Doc. 19 ¶¶ 37, 50; Doc. 24 ¶¶ 37, 50.)  There is undisputed evidence, however, of specific police interaction with LSC patrons engaging in criminal behavior.  For example, on February 2, 2006, Minnick observed a hand-to-hand drug transaction outside of the tavern, which led him to stop and arrest the participants and recover narcotics.  (See Doc. 18, Ex. B at 37-38; Doc. 19 ¶ 52; Doc. 24 ¶ 52.)  On a subsequent occasion, Minnick observed a known burglary suspect enter the bar; Minnick followed the suspect inside, requested that the suspect step outside for questioning, and arrested the suspect once his identity was confirmed.  (See Doc. 18, Ex. B at 36; Doc. 19 ¶ 51; Doc. 24 ¶ 19.)  There is no contention that either of these instances amounted to a Fourth Amendment violation.

## C.  Licensing Appeal: Late 2006

Smith's appeal of the PLCB licensing decision eventually proceeded to an administrative hearing in August 2006.  (See Doc. 18, Ex. D at 47-48.)  Smith was represented by counsel, was provided the opportunity to present and cross examine witnesses, and proffered argument.  (See id.)  Following the hearing, an administrative law judge affirmed the PLCB decision.  (See id. at 49-50.)  Smith

---

[7] Among the Lebanon bars Minnick entered for such purposes are Cedars Bar, Evergreen, Manicourt Club, Silver Dollar, Royal Men's Club, Navy Club, VFW, and Saint Gertrude's.  (Doc. 18, Ex. B at 43.)

appealed once more, and was again permitted to continue operating LSC pending review by the Pennsylvania state courts.  (See id. at 50.)  On December 27, 2006, the Lebanon County Court of Common Pleas reversed PLCB's decision and ordered the agency to renew LSC's liquor license for an additional two-year period.  (See Doc. 24, Ex. 3.)  None of the civil rights claims raised in the matter *sub judice* concern PLCB's licensing decision, nor do they contend that individual PLCB employees are liable based upon their involvement in the agency's decision-making process.

### D.  <u>Procedural History</u>

Smith commenced the instant suit on July 3, 2007, alleging violations of her constitutional rights under 42 U.S.C. § 1983, and her right to freely operate her business under state law.  Specifically, Smith contends that she was deprived of the (1) First Amendment right to engage in the business of her choosing; (2) First Amendment right to associate with and serve the population of her choosing; (3) Fourteenth Amendment right to equal protection of the laws; (4) Fourteenth Amendment right to substantive due process; and (5) right to conduct her business affairs free of undue governmental interference pursuant to an undefined provision of Pennsylvania law.  (See Doc. 1 at 4-6.)  Defendants filed a motion for summary judgment on March 18, 2008, questioning whether each of Smith's claims is cognizable and asserting that she has nevertheless failed to produce sufficient evidence to sustain liability under any of the assertions.  (Doc. 17.)  The individual defendants—Anspach, Minnick, and Lear—also invoke the doctrine of qualified

9

immunity as a shield from suit.  The parties have fully briefed these issues, which are now ripe for disposition.

## II.  **Standard of Review**

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  <u>See</u> Fed. R. Civ. P. 56(c).  The burden of proof is upon the nonmoving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); Fed. R. Civ. P. 56(e); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the nonmovant on the claims.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986); <u>see also</u> Fed. R. Civ. P. 56(c), (e).  Only if this threshold is met may the cause of action proceed.  <u>Pappas</u>, 331 F. Supp. 2d at 315.

## III.  **Discussion**

Smith brings her constitutional claims exclusively under 42 U.S.C. § 1983, a provision of the United States Code that offers private citizens a means to redress violations of federal law by state officials.  <u>See</u> 42 U.S.C. § 1983.  The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Id. Section 1983 is not a source of substantive rights, but merely a method to vindicate violations of federal law committed by state actors. Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To establish a claim under this section, the plaintiff must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law." Id. (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)). Thus, the initial step in evaluating a contention raised pursuant to § 1983 is "to identify the exact contours of the underlying right said to have been violated and to determine whether the plaintiff has alleged a deprivation of a constitutional right at all." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (quoting Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000)).

In the instant matter, Smith alleges a deprivation of what she characterizes as her First Amendment right to engage in business free of government interference, and her Fourteenth Amendment rights to equal protection and substantive due process. (Doc. 1 at 4.) The court will address each of these issues *seriatim*.

## A.    <u>First Amendment Liability</u>

As stated above, the first step in evaluating a contention raised pursuant to

§ 1983 is "to identify the exact contours of the underlying right said to have been

violated and to determine whether the plaintiff has alleged a deprivation of a

constitutional right at all." <u>Kaucher</u>, 455 F.3d at 423 (internal quotations omitted).

It is at this prefatory step where Smith's purported First Amendment claims

encounter difficulty.  Smith tasks the court with discerning "how far pursuit of a

legitimate government interest can go, when it is driven by a politically expedient

objective, in intruding into the rights of its citizenry to engage in a business

enterprise of their choosing."  (Doc. 27 at 5.)  She accuses Anspach, Minnick, and

Lear of a "campaign of harassment and intimidation," (<u>id.</u> at 6), and invokes a First

Amendment "right to engage in the business of [her] choosing and to associate with

and serve the population of [her] choosing," (Doc. 1 at 4).  Smith fails, however, to

further explain her theory of business interference liability, to pinpoint a single

authority of law relevant to such a theory,[8] or otherwise to delineate the contours of the cognizable First Amendment rights she claims were violated.  To put it generously, her pleadings are difficult to follow.

The court will nonetheless attempt to decipher Smith's rather inscrutable First Amendment assertions.  As an initial matter, the Constitution recognizes no "First Amendment right to engage in the business of [one's] choosing," (Doc. 1 at 4). However, the inceptive amendment does, *inter alia*, protect limited rights of expressive and intimate association.  See <u>Roberts v. United States Jaycees</u>, 468 U.S. 609, 618-20 (1984); <u>Pi Lambda Fraternity, Inc. v. Univ. of Pittsburgh</u>, 229 F.3d 435, 443 (3d Cir. 2000).

To the extent that Smith is proffering an expressive association claim, such an assertion clearly fails.  Expressive association safeguards the right to associate

---

[8] Smith's brief in opposition to the motion for summary judgment contains just three case citations, one of which refers to <u>Monell v. Department of Social Services</u> for the now-unremarkable proposition that a municipality may be held liable for its unconstitutional policies.  (<u>See</u> Doc. 27.)  The second citation provided is to <u>Valle v. Stengel</u>, a 1949 Third Circuit opinion, wherein the appeals court expounds at length on the contours of the Privileges and Immunities Clause of Article IV of the Constitution, and discusses the extent to which this clause embraces the freedom of contract.  <u>See</u> 176 F.2d 697, 703-04.  This commentary has no bearing on Smith's First Amendment "right to engage in the business of her choosing," or her associational rights.  The final citation, to <u>Thomas v. Independence Township</u>, 463 F.3d 285 (3d Cir. 2006), is more recent, but also unsupportive of Smith's novel First Amendment right to business claim.  <u>Thomas</u> is a qualified immunity decision and concerns those instances in which "a lack of factual specificity in a complaint prevents the defendant from framing a fact-specific qualified immunity defense."  <u>Id.</u> at 289.  Although the individual defendants in the matter *sub judice* invoke qualified immunity as a barrier to liability, its invocation is unnecessary given Smith's inability to make a prima facie showing on any of her claims, <u>see</u> <u>infra</u>; hence, <u>Thomas</u> is inapposite.

for the purpose of engaging in speech, assembly, the right to petition, and the free exercise of religion—in other words, those rights protected by the First Amendment. Roberts, 468 U.S. at 618-20 (explaining that the right to associate for expressive purposes protects those engaging in "political, social, educational, religious, and cultural ends"); Pi Lambda, 229 F.3d at 441 (same); see also Schultz v. Wilson, Civ. A. No. 1:04-CV-1823, 2007 WL 4276696, at *7 (M.D. Pa. Dec. 4, 2007) ("Activity that commonly implicates the right includes that which fosters moral development, religious expression, political discourse, community engagement, cultural commentary, and similar civic purpose."), aff'd, 304 F. App'x 116 (3d Cir. 2008); Via v. Taylor, 224 F. Supp. 2d 753, 759-60 (D. Del. 2002) (describing expressive association as "the right to associate for the purpose of engaging in activities protected by the First Amendment, such as speech, assembly, petition for the redress of grievances, and the exercise of religion"). Smith does not assert that her right to "associate with and serve the population of [her] choosing" is connected to any expressive activity protected by the First Amendment; she simply argues that the constant police presence near LSC has depressed business at the tavern. Quite obviously, the right of expressive association does not encompass some unfettered right to engage in sales of intoxicating beverages to the public, and the court rejects plaintiffs' efforts to invent one.

Smith also fails to state a cognizable claim under an intimate association theory. The right of intimate association protects the closest and most interdependent of human relationships against state interference. See Pi Lambda,

14

229 F.3d at 441-42.  Relationships that "by their nature involve deep attachments and commitments to the necessarily few other individuals with whom one shares . . . distinctively personal aspects of one's life" are of the type that fall within the ambit of intimate association.  Id. (quoting Roberts, 468 U.S. at 619-20); see also Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 545 (1987).  Family bonds represent the quintessential form of intimate association, but the right may also extend to other relationships based on the "size, purpose, policies, selectivity, [and] congeniality" of the group among which the relationships occur.  Id. at 442 (quoting Roberts, 468 U.S. at 620).  There is no specified size beyond which a group ceases to be intimate.  Nevertheless, intimacy requires a small, tightly knit group, and gatherings of as few as twenty individuals have been denied intimate association status when they feature only social acquaintanceships.  See Duarte, 481 U.S. at 546-47 (holding that local rotary clubs, which varied in size from twenty to nine hundred members, were not protected associations); Pi Lambda, 229 F.3d at 442 (holding that fraternity of twenty-two individuals was too large to qualify as an intimate association, in part because it had sometimes had as many as eighty active members).

Smith does not contend that the relationship between LSC and its clientele is sufficiently intimate to warrant First Amendment protection and, were she to do so, her claim would fail.  LSC is a public drinkery open to any that pass through its entrance.  Thus, the size of the "group" is limited only by the number of customers fancying an alcoholic beverage during LSC's hours of operation.  Moreover, even if

the LSC customer base were exceedingly insular, there is no evidence that Smith

maintains any more than an arm's-length relationship with the tavern's patrons.

Smith's theory of intimate association—were it applicable herein—would render

intimate most, if not all, public restaurants and bars. The court is unwilling to

countenance such an expansion, especially in light of Smith's failure to offer any

authority consistent with this approach. Summary judgment on the proffered First

Amendment claims is therefore appropriate.

### B. <u>Equal Protection</u>

Smith's equal protection claim is premised on the theory that the individual

defendants treated the tavern dissimilarly from other Lebanon drinking

establishments, and that Minnick and Lear specifically harassed LSC's patrons.

Smith does not purport to belong to a protected class, but instead appears to invoke

the "class of one" theory announced by the United States Supreme Court in <u>Village</u>

<u>of Willowbrook v. Olech</u>, 528 U.S. 562 (2000) (per curiam). Under that theory, a

plaintiff may establish an equal protection violation via proof that he or she was

"intentionally treated differently from others similarly situated" and "that there is

no rational basis for the difference in treatment." <u>Olech</u>, 528 U.S. at 564; <u>see also</u>

<u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 239 (3d Cir. 2006).

The record fails to establish that municipal officials treated LSC differently

from other similarly situated Lebanon taverns. Rather, the undisputed evidence

demonstrates that Minnick and Lear routinely entered a number of local drinking

establishments searching for criminal suspects or those in violation of the terms of

their probation.  (See Doc. 18, Ex. B at 43; Doc. 19 ¶¶ 36, 38, 53; Doc. 24 ¶¶ 36, 38, 53.)

Smith offers no evidence to counter this testimony, and proffers virtually nothing to

establish the manner in which police officers conducted themselves vis-à-vis other

taverns.  In fact, Smith's primary argument concerning differential treatment is

that a bar located in Lebanon's southwest quadrant—Connors Tavern—generated

more frequent citizen complaints but received less attention from law enforcement.

(See Doc. 27 at 8.)  This assertion is unsupported by record evidence.  Although

Lear testified that the Lebanon police department "probably" receives a greater

volume of complaints concerning Connors Tavern, there is absolutely nothing in

Lear's deposition—or any other portion of the record—to indicate how these

complaints were handled by law enforcement personnel.  (See Doc. 18, Ex. C at 62-

64.)  The burden to develop such testimony lies with Smith, see Anderson, 477 U.S.

at 250-57; because she neglects to carry this burden, her claims of differential

treatment based upon the Lebanon police department's interaction with Connor's

Tavern necessarily falls short.

Even if Smith had demonstrated that law enforcement personnel treated

LSC differently from the way in which similar establishments were treated, there is

no evidence that such behavior was irrational.  The record clearly indicates that

LSC clientele presented public safety concerns that other bars did not.  LSC is

located in a high-incidence crime area, and its patrons' conduct precipitated an

above-average quantity of citizen complaints.  Narcotics activity in and around the

tavern was frequent and, Smith concedes, went unreported by LSC staff.  (See Doc.

17

18, Ex. B at 13; id., Ex. D at 11-12.)  It is unsurprising that police would visit LSC routinely, given the regularity with which unlawful behavior admittedly transpired therein.[9]  Furthermore, it is conceded that when officers did interact with LSC clientele, they did so within the bounds of the Fourth Amendment.[10]  (See Doc. 18, Ex. B at 36-38; Doc. 19 ¶¶ 37, 50; Doc. 24 ¶¶ 37, 50.)  In sum, officers were confronted with an establishment around which recurrent lawbreaking transpired; it can hardly be claimed that law enforcement personnel act irrationally when they

---

[9] Smith also argues that Anspach improperly targeted LSC for purposes of political expediency, but the evidence belies such an assertion.  Anspach testified that he considered the tavern a "nuisance bar" because its patrons were the source of a large number of noise and public intoxication complaints.  (Doc. 19 ¶ 20; Doc. 24 ¶ 20.)  LSC shared this distinction with two other alehouses, all three of which were a focus of Anspach's anti-crime electoral platform.  (See Doc. 19 ¶¶ 19, 23; Doc. 24 ¶¶ 19, 23.)  When Anspach spoke with PLCB regarding problematic Lebanon drinking establishments, he referred the agency to each of these "nuisance bars."  (See Doc. 18, Ex. A at 37.)  This evidence strongly indicates that Anspach targeted all "nuisance bars" in a similar fashion and did so in a manner reasonably related to the public safety concerns presented by each tavern.

[10] Adherence to the Fourth Amendment does not necessarily mean that officers were non-discriminatory in their interactions with the minority patrons of LSC.  See Bradley v. United States, 299 F.3d 197, 205 (3d Cir. 2002) ("The fact that there was no Equal Protection violation does not mean that one was not discriminatorily selected for a search.").  To state an equal protection claim as a result of officer profiling, however, a plaintiff must prove that an officer's actions (1) had a discriminatory effect, and (2) were motivated by a discriminatory purpose.  Id.  Proving the first prong of this inquiry requires the plaintiff to show that he or she belongs to a protected class and was treated differently from similarly situated individuals.  Id. at 206.  Smith does not claim to belong to a protected class and, as discussed supra, she has presented no evidence of differential treatment.  Neither has Smith produced any evidence that Minnick, Lear, or Anspach acted pursuant to a discriminatory purpose.  In short, to the extent that Smith is raising a profiling claim under the Equal Protection Clause—and it is unclear whether she is—such a claim is wholly unsupported by the record.

attempt to thwart behavior that is violative of state and federal law via methods consistent with the Fourth Amendment. See Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 133-34 (3d Cir. 2002) (explaining that government action is "reasonable, not arbitrary and bears a rational relationship to a (permissible) state objective" when it promotes public safety interests). Smith has failed to establish either differential treatment or irrational government behavior. See Heller v. Doe, 509 U.S. 312, 320 (1993) (stating that the burden is on the plaintiff to prove that government conduct lacks a rational basis). Summary judgment is therefore appropriate.

### C. Substantive Due Process

In conclusory fashion, Smith claims that her right to substantive due process was violated by the actions of Minnick, Lear, and Anspach. (See Doc. 1 ¶ 18.) "To prevail on a non-legislative substantive due process claim, 'a plaintiff must establish as a threshold matter that [s]he has a protected property interest to which the Fourteenth Amendment's due process protection applies.'" Nicholas v. Pa. State Univ., 227 F.3d 133, 139-40 (3d Cir. 2000) (quoting Woodwind Estates, Ltd. v. Gretkowski, 205 F.3d 118, 123 (3d Cir. 2000)). Only those property interests that are considered "fundamental" are protected by substantive due process principles. Hill, 455 F.3d at 234. Success on a substantive due process claim requires the plaintiff to not only demonstrate that he or she was deprived of a protected property interest, but also that this deprivation was arbitrary and capricious. County Concrete Corp. v. Twp. of Roxbury, 442 F.3d 159, 165 (3d Cir. 2006); see also

19

United Artists Theatre Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392, 399 (3d Cir. 2003).  As the Third Circuit Court of Appeals has explained, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense." Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 400-01 (3d Cir. 2000).

The first step in stating a cognizable substantive due process claim requires a plaintiff to describe the protected property interest of which he or she was arbitrarily deprived.  See Nicholas, 227 F.3d at 139-40.  Smith fails to explicitly delineate any such interest, and instead relies on the general assertion that she suffered a "violation of her liberty and property interests in her occupation as a tavern owner."  (Doc. 27 at 7.)  The meaning of this statement is not altogether clear, though the court is willing to assume—for the sake of argument—that Smith is alleging that the presence of officers somehow harmed her business and that this business injury affected a fundamental property right.

Even so, Smith's substantive due process claim flounders at the second step of the inquiry, for none of the executive conduct depicted in the record is of the conscience-shocking variety.  See Boyanowski, 215 F.3d at 401 (explaining that a substantive due process violation requires an "executive abuse of power . . . which shocks the conscience" (quoting County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998))).  A government actor's conduct does not shock the conscience merely because it was performed with an improper purpose or in bad faith; rather, the doctrine constrains only those activities that have no reasonable relation to legitimate government objectives.  See United Artists Theatre, 316 F.3d at 400-02;

20

Corneal v. Jackson Twp., 313 F. Supp. 2d 457, 465-66 (M.D. Pa. 2003), aff'd, 94 F. App'x 76 (3d Cir. 2004).  As discussed above, the individual defendants' conduct was legitimate and reasonably related to combating the criminal behavior in and around LSC.  See supra Part III.B.  Accordingly, the executive action depicted in the record was rational, and summary judgment is warranted.

### D. **Municipal Liability**

A municipality may be subject to liability if the plaintiff can "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  Bd. of County Comm'rs v. Brown, 520 U.S. 397, 403 (1997) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)).  However, in the absence of an underlying constitutional violation, see supra Parts III.A-C, Smith's constitutional tort claims against Lebanon fail as a matter of law.  See Sanford v. Stiles, 456 F.3d 298, 314 (3d Cir. 2006) (requiring constitutional violation as prerequisite to municipal liability);

Grazier ex rel. White v. City of Phila., 328 F.3d 120, 124 (3d Cir. 2003) (same).

Summary judgment will therefore be granted in Lebanon's favor.[11]

---

[11] In addition to her constitutional claims, Smith contends that defendants interfered with her business relations under state law. (See Doc. 1 ¶¶ 21-24.) Although Smith does not clearly articulate the parameters of this argument, it appears to arise under Pennsylvania tort law. Thus, in order to proceed with the claim, the court must assert supplemental jurisdiction, an avenue across which it declines to tread. Summary judgment is appropriate with respect to each of Smith's federal claims; to retain federal jurisdiction over what would be purely an issue of state law does not serve the interests of judicial economy, convenience, fairness to the instant parties, or comity, see Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) (stating that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims").

Even if the court were to retain jurisdiction over this claim, it would nonetheless grant summary judgment in defendants' favor as a result of Smith's failure to defend. Defendants moved for summary judgment on the state-law issue and Smith's counsel has not responded. (See Doc. 20 at 19-23; Doc. 27.) As such, Smith has abandoned the claim. See Smith v. Lucas, No. 4:05-CV-1747, 2007 WL 1575231, at *10 (M.D. Pa. May 31, 2007) (holding that the plaintiff abandoned claims by failing to oppose them in response to a motion for summary judgment); Clarity Software, LLC v. Allianz Life Ins. Co. of N. Am., No. 2:04-cv-1441, 2006 WL 2346292, at *5 (W.D. Pa. Aug. 11, 2006) (same); Cacciatore v. County of Bergen, No. Civ. A. 02-1404, 2005 WL 3588489, at *1 n.1 (D.N.J. Dec. 30, 2005) (same).

## IV.    Conclusion

For the foregoing reasons, defendants are entitled to summary judgment on all of the federal claims set forth in the complaint.  Smith's purported First Amendment right to operate a tavern free of government interference is not cognizable under the Constitution.  Furthermore, she has not proffered evidence sufficient to support those claims that are potentially cognizable—in this instance, those invoking equal protection and substantive due process.  The record portrays a municipality attempting to address a crime problem and protect the public; defendants' reasonable measures to accomplish this goal hardly amount to a civil rights violation under 42 U.S.C. § 1983.

An appropriate order follows.


  S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:       November 12, 2009

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LORI SMITH and ROB FAM, INC.,** | : | **CIVIL ACTION NO. 1:07-CV-01207** |
| **t/a LIBERTY SQUARE CAFÉ,** | : | |
| | : | **(Judge Conner)** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF LEBANON, LAWRENCE** | : | |
| **MINNICK, DAVID LEAR, and** | : | |
| **ROBERT ANSPACH,** | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW, this 12th day of November, 2009, upon consideration of

defendants' motion (Doc. 17) for summary judgment, and for the reasons set forth

in the accompanying memorandum, it is hereby ORDERED that:

1. The motion (Doc. 17) for summary judgment is GRANTED.  <u>See</u> Fed.
   R. Civ. P. 56(c).

2. The Clerk of Court is directed to enter JUDGMENT in favor of
   defendants and against plaintiffs on all claims.

3. The Clerk of Court is directed to CLOSE this case.


    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge